Leonard I. SCHREIBER, Plaintiff,

v.

A. R. JACOBS, Clare Stephen Jacobs, F. L. Jacobs, John F. Jacobs, Rex Closser Jacobs, Martin T. Vanden Bosch, Dudley H. Waters, J. F., Inc., and F. L. Jacobs Co., Defendants.

Civ. No. 12079.

United States District Court, E. D. Michigan, S. D.

Jan. 14, 1955.

See also D.C., 121 F.Supp. 610.

Fischer, Brown, Sprague, Franklin & Ford, Leon R. Jones, Detroit, Mich., for plaintiff.

Goddard, McClintock, Fulton & Donovan, James I. McClintock, and Theodore Souris, Detroit, Mich., for F. L. Jacobs Co.

Clark, Klein, Brucker & Waples by George Klein, Detroit, Mich., for F. L. Jacobs, A. R. Jacobs, John F. Jacobs, and Clare Stephen Jacobs.

George S. Fitzgerald, Detroit, Mich., for Rex Closser Jacobs.

Shapero & Shapero, Samuel Shapero, Detroit, Mich., and Nemerov & Shapiro, Mortimer Shapiro, New York City, for Theodore Fishberg, a stockholder.

THORNTON, District Judge.

On August 25, 1952, a derivative action was instituted in this Court by Leonard I. Schreiber as a stockholder and owner of 100 shares of the common stock of the F. L. Jacobs Co., and naming as defendants the F. L. Jacobs Co., a Michigan corporation, the J. F., Inc., a Michigan corporation, and a group of individual defendants who, as of January 1, 1952, were directors of the F. L. Jacobs Co. The complaint alleges in part, and upon information and belief, that on or about May of 1952 all of the then directors of the Company, each of whom had full knowledge of the facts, entered into a conspiracy with Rex Closser Jacobs to mulct the Company, further alleging certain overt acts done in consummation of this alleged conspiracy, and seeking, by way of relief:

1. That the defendants be enjoined from consummating the agreement of June 20, 1952, between J. F., Inc. and the Company.

2. That the individual defendants and the Company be enjoined from causing the Company to make any payments to J. F., Inc. pursuant to the agreement of June 20, 1952, between J. F., Inc. and the Company.

3. That the Court set aside and declare null and void the agreement of June 20, 1952, between J. F., Inc. and the Company.

4. That the Court require J. F., Inc. and the individual defendants, jointly and severally, to account to the Company for their respective profits, and for the Company's losses by reason of the acts and transactions alleged in the complaint.

5. That the Court award plaintiff the costs and expenses of this action, including reasonable counsel fees, and grant plaintiff such other and further relief as may be just.

Subsequent to the commencement of the within action, and on or about December 15, 1952, the Management and Board of Directors of the F. L. Jacobs Co. were reorganized pursuant to an overwhelming vote of the stockholders

and, as a result, the Jacobs family and its nominees were removed from the control of the Company. In February of 1953 a suit by J. F., Inc. was instituted in the Circuit Court for the County of Wayne, State of Michigan, against the F. L. Jacobs Co., which has been commonly referred to as the "J. F., Inc. suit." In March of 1953 a derivative suit was instituted in the Wayne Circuit Court on behalf of the F. L. Jacobs Co. which has been commonly referred to as the "Kinard suit." In April of 1953 the F. L. Jacobs Co. commenced an action in the Wayne Circuit Court against Rex C. Jacobs and other members of the Jacobs family, which has been commonly referred to as the "F. L. Jacobs Co. suit." When we add to the foregoing the suit pending in this Court, which has been commonly referred to as the "Schreiber suit" we find that between August of 1952 and April of 1953 there were commenced, and there are presently pending, four causes of action which involve the F. L. Jacobs Co. in one way or another.

In July of 1954 an agreement of settlement was entered into by and between F. L. Jacobs Co., J. F., Inc., Rex C. Jacobs, as president of J. F., Inc. and Virginia Farrell Jacobs, his wife, it being the claim of the F. L. Jacobs Co. that it entered into the agreement of settlement to terminate all of the litigation involving its former management for the following reasons:

"1.   To procure for its immediate use as working capital $540,000.00 of the $750,000.00 theretofore deposited with the Court by the Company to release garnishments of $2,262,774.05, levied upon the Company's accounts receivable in the $3,000,000.00 law suit by J. F., Inc.;

"2.   To release itself from the restrictions upon business expansion and product diversification resulting from the Injunction issued by this Court;

"3.   To relieve itself from the adverse effects that the litigation,

particularly this receivership action, has upon its credit;

"4.   To eliminate the very substantial expenses involved in continuing the litigation;

"5.   To eliminate the diversionary effect the litigation has had on the efforts of the Company's executives;

"6.   To minimize the adverse effect the litigation has already had on the Company's relations with its customers and to avoid the disastrous effect on its customer relations if the suits were tried; and

"7.   To avoid the possibility of an adverse judgment in J. F., Inc.'s suit for damages against the Company in the amount of $3,000,000.-00."

Out of this agreement of settlement grew a stipulation of dismissal between the interested parties, and a motion for an order to show cause why this Court should not approve the compromise and dismissal of the derivative action known as the "Schreiber suit." A hearing for this purpose was set for the 30th day of September, 1954, at 2:00 p. m., and proper notice of the said hearing was mailed to all the stockholders of the F. L. Jacobs Co. on or about September 10, 1954, which notice also included notice of a hearing in the Wayne Circuit Court on the same day at 3:30 p. m., for the same purpose in relation to the litigation pending in the State court, together with a description of the nature of the litigation, and a description of the proposed settlement. A notice was also given of a meeting of the common and preferred stockholders of the F. L. Jacobs Co. on the morning of the same date, and at this meeting the Management of the F. L. Jacobs Co. recommended approval of the agreement of settlement. At this meeting there were represented, by proxy and in person, 523,833 shares of common stock out of a total number of shares of common stock outstanding at that time of 637,261, which is a representation of approximately 82.2 per

cent of the actual shares outstanding that were present at this meeting. Of this number present at the meeting, 490,662 shares were voted for approval of the settlement agreement, and this figured out at approximately 93.6 per cent of the shares represented at the meeting, and there were 19,181 shares present that voted against the agreement of settlement, which was approximately 3.7 per cent of the shares that were represented at the meeting.

On the afternoon of September 30, 1954, at the hearing of the show cause, the matter of the approval of the agreement of settlement and of dismissal of the "Schreiber suit," was submitted to this Court, and upon the Court's inquiry as to whether or not there were any objections to the proposed settlement and dismissal, a Mr. Theodore Fishberg, through his counsel, he not being present in person, announced that he was the owner of 300 shares of the stock of F. L. Jacobs Co. and that he objected to the Court approving the dismissal of the "Schreiber suit" on the basis of the proposed agreement of settlement.

The hearing was thereupon adjourned until November 3, 1954, and at the November 3rd hearing the objecting stockholder, Mr. Fishberg, again appeared through counsel, but not in person, and the Court was informed that the objecting stockholder, Mr. Fishberg, did not appear at the stockholders' meeting of September 30, 1954, in person, through counsel, or through a proxy, to raise any objections to the action of the stockholders in approving or disapproving the proposed settlement.

At the adjourned hearing on November 3, 1954, the proposed agreement of settlement was again submitted to the Court, together with the files and records of the four aforementioned pending lawsuits.

There was testimony by three officials of the present management of the F. L. Jacobs Co. and an offer of an abstract of testimony, taken by oral deposition, of certain parties in the different pending lawsuits, which was subsequently furnished in conjunction with a memorandum brief; the objecting stockholder, through his counsel, cross-examined the Management witnesses, participated in argument in opposition to the Court's granting approval, and submitted a brief, but no evidence in support of his opposition. In his brief he states that:

" * * * we intend to establish herein that the said Agreement of Settlement cannot and should not be approved by this Court or by the Federal District Court (a) without a full and complete hearing on the merits of the respective actions, and (b) unless and until the Court makes a finding that there is no merit to the said actions,"

and then proceeds to describe the subject matter of each of the pending lawsuits involved in the agreement of settlement as follows:

"Re: The Schreiber Suit

"This suit was commenced in August of 1952 and is a derivative action brought on behalf and for the benefit of F. L. Jacobs Co. and its stockholders against the former directors of F. L. Jacobs Co. It alleges that for many years prior to June of 1952, the Jacobs family, headed by Rex C. Jacobs, dominated and controlled F. L. Jacobs Co.; that on June 20, 1952, Rex C. Jacobs resigned as president and was succeeded by his brother, Clare Stephen Jacobs; that on the same day, to wit, June 20, 1952, the Jacobs family, then in control of the company, caused F. L. Jacobs Co. to enter into an exclusive sales agency with J. F., Inc. a corporation newly organized for that purpose by Rex C. Jacobs and the other members of the Jacobs family; that pursuant to said agreement, J. F., Inc. became the exclusive sales agent of F. L. Jacobs Co. under an arrangement which was calculated to yield 'a stupendous and assured profit' to J. F., Inc. estimated to amount to approximately $3,000,000. for the

subsequent three years. It is further alleged that said agency agreement was illegal, improvident and a waste of the company's assets, designed solely to enrich the Jacobs family at the expense of F. L. Jacobs Co. The relief requested in the complaint was that the said agency agreement be set aside and declared null and void and that J. F., Inc. and the individual defendants account to the F. L. Jacobs Co. for their profits and for losses to F. L. Jacobs Co. by reason of the acts alleged therein.

"The present management of F. L. Jacobs Co. which, after a successful proxy fight with the Jacobs family, acquired control of the company in December of 1952, interposed an amended answer to the Schreiber complaint on behalf of the company dated March 16, 1953 in which it supported the allegations of the complaint and likewise asserted that the said agency agreement was illegal and improper, without validity and designed primarily to enrich J. F., Inc. and its stockholders. The said amended answer further alleges that J. F., Inc. was improperly paid out of the funds of F. L. Jacobs Co. the sum of $226,-438. under said agency agreement and that the recovery of said amount is sought from J. F., Inc."

"Re: The J. F., Inc. Suit

"This suit was commenced by J. F., Inc. in February of 1953 in this Court against F. L. Jacobs Co. It alleges that the present management of F. L. Jacobs Co. wrongfully, arbitrarily and improperly breached the sales agreement in January of 1953 and seeks damages from F. L. Jacobs Co. for such breach to the extent of $3,000,000.-00."

"Re: The Kinard Suit

"This suit was commenced on March 21, 1953 in this Court. It is also a derivative suit brought on behalf and for the benefit of F. L. Jacobs Co. and its stockholders. The individual defendants are virtually all of the present directors and officers of the company. The complaint charges the directors with acts of waste and gross mismanagement to the damage of the corporation. It alleges that prior to August of 1952 the individual defendants formed an unlawful conspiracy to acquire control of F. L. Jacobs Co. for their own financial gain and without regard to the rights of the corporation or its stockholders; that when said defendants acquired control they embarked upon a program to systematically mulct the treasury of the company and to 'defraud' the company and its stockholders; that they voted themselves lucrative positions at excessive salaries, used company funds for their personal traveling and living expenses, and set up a central purchasing agency which created excessive and wasteful expenses which could be used by them to unlawfully enrich themselves by secret rebates and kickbacks and other hidden profits to the detriment of the company.

"The complaint further alleges that the company's breach of the said sales agency agreement with J. F., Inc. was accomplished without the approval of the board of directors and was otherwise improper and subjected the company to the aforesaid suit by J. F., Inc., and that the individual defendants should account to and reimburse the company for any damages which the company may sustain by reason of said breach of the sales agency agreement."

"Re: The F. L. Jacobs Co. Suit

"This suit was commenced by F. L. Jacobs Co. in April of 1953 in this Court against Rex C. Jacobs and other members of the Jacobs family and other individuals constituting the former management of

F. L. Jacobs Co. The bill of complaint and amendments thereto charge the defendants with abusing their positions as directors of the company, of violating their fiduciary obligations, of self-enrichment at the expense of the company and otherwise acting against the interests of the company. It is alleged that the claims set forth therein were discovered during an investigation and audit made by certified public accountants of the company's affairs and transactions during the years when the Jacobs family were the officers and directors of the company. It must be borne in mind that this suit is a company suit brought only after an intensive examination of the company's books and records. Under these circumstances it must be assumed that the claims are well founded and that the company has within their control all necessary evidence to substantiate its charges. Over twenty-five specific acts of breaches of trust are alleged which the company asserted, caused damage to it of over $1,000,-000.

"Among the breaches of trust charged were several wherein the Jacobs family was alleged to have wrongfully appropriated to themselves corporate funds. Among such are the following:

"1. $40,000. was paid to Delmar Beauty School, Inc. allegedly for commissions. Delmar Beauty School was owned by the wife of Rex C. Jacobs.

"2. Over $150,000. was spent for purchase and maintenance of power boats used for the personal benefit of Rex C. Jacobs.

"3. Over $7,000. was paid for improvements on real estate owned by the mother of Mrs. Rex C. Jacobs.

"4. $20,000. was paid to Raymond H. Jacobs, the nephew of Rex C. Jacobs and the son of Fred L. Jacobs for no consideration. The moneys were turned over to Fred L. Jacobs.

"5. Over $13,000. was paid to Rex C. Jacobs. Subsequently, 1,000 shares of F. L. Jacobs Co. stock (then market, 10⅝–11⅛ per share) was given to the corporation as security under an agreement that the liability of Rex C. Jacobs was to be limited to the market value of the stock at time demand for payment would be made. Market value today of said stock is not more than $7,000.

"6. About $6,000. was improperly credited to Rex C. Jacobs' account and charged to selling and advertising.

"7. $14,300. was paid to a tax consultant for personal services rendered to Rex C. Jacobs.

"8. Several other claims allege substantial improper payments to various individuals without benefit to the corporation under circumstances which indicated that the payments were made for the personal benefit of. Rex C. Jacobs.

"9. From 1947 to 1952, salaries and bonuses aggregating $1,429,-037., which were paid to five members of the Jacobs family both individually and as a group, were grossly excessive.

"10. $163,181. paid to Rex C. Jacobs during said period for reimbursement of expenses was excessive and constituted a gross misapplication and waste of corporate funds.

"11. The plaintiff, F. L. Jacobs Co., further alleges that the sales agreement with J. F., Inc.,

" 'was not valid or enforceable against the will of the plaintiff. Plaintiff has been put to great expense and loss on account of said agreement and the litigation concerning same, and in the event its aforesaid contention with respect thereto is sustained in such litiga-

tion, plaintiff looks to all of the defendants herein for the recovery of all sums, including expenses and all damages flowing directly or indirectly from the action of the defendants in entering into said agreement, and will seek recovery of all such sums herein.'

"This latter claim in effect seeks to recover from the Jacobs family almost $300,000. already paid to J. F., Inc. under the sales agreement."

This Court is familiar with the subject matter of the three lawsuits presently pending in the Wayne Circuit Court by virtue of a determination previously made that the proceedings involved in the "Schreiber suit," pending in this Court, should be stayed until the State court actions shall have been terminated. Schreiber v. Jacobs, 121 F. Supp. 610.

The contested agreement of settlement proposes substantially as follows:

1. That all of the pending lawsuits are to be dismissed with prejudice;

2. That F. L. Jacobs Co. shall pay to J. F., Inc. the sum of $210,000.00; and

3. That all claims and counterclaims, if any, of whatever nature between F. L. Jacobs Co. and Mr. and Mrs. Rex C. Jacobs shall be forever released and discharged.

In Berger v. Dyson, D. C., 111 F.Supp. 533, 535, is found the following:

"The dismissal of a class action pursuant to an offer of compromise is discretionary with the Court. * * * This discretion is to be exercised on the basis of evidence before the Court, and a compromise will be approved only if the Court finds that the compromise is in the best interests of the corporation and its stockholders. * * * The burden is on the proponents of a. compromise to show that the proposed compromise is fair, and that an acceptance of its terms. will be.

to the best interests of the corporation."

To assist the Court in exercising proper discretion in this matter, there is available by way of evidence the following:

The files and records of the four pending lawsuits; the action of the present Board of Directors in approving the settlement; the action of the stockholders of the F. L. Jacobs Co., a majority of which approved the agreement of settlement; the testimony of three officials of the present management at the hearing on the Order to Show Cause; and the abstracts of testimony taken from the depositions of Clare S. Jacobs, Rex C. Jacobs, W. H. Waters, Martin T. Vanden Bosch, Alvin R. Jacobs, and John F. Jacobs, all former officers and directors of the F. L. Jacobs Co., said depositions having been taken in relation to the pending lawsuits in both the Wayne Circuit Court and this District Court.

The position of the objecting stockholder that this Court cannot and should not approve the agreement of settlement "without a full and complete hearing on the merits of the respective actions" is not well taken, since it is exactly contrary to the obvious import of the language of Rule 23(c), Fed.Rules Civ.Proc. 28 U.S.C.A. His further contention that the Federal District Court cannot and should not approve the agreement of settlement "until the Court makes a finding that there is no merit to the said action" requires that this Court analyze the evidence before it, and in that light the following excerpts from the abstracts of the sworn testimony at the deposition hearings have been of assistance to the Court in reaching a determination:

"During the period before and during World War II the company had a sales agency agreement with the Hurd-Waters Corporation and its predecessor to handle essentially all of the sales of the company's products. The company was at that

time engaged exclusively in war work. The original commission paid to the Hurd-Waters Corporation and its predecessor was 3% and, some time during the war, it was reduced to 1¼%."

"The Hurd-Waters Corporation agreement with the company ceased sometime in 1944 or 1945 at the time of the death of Mr. Hurd. During the existence of the Hurd-Waters contract with the company, the company did not maintain any sales organization of its own. Following the Hurd-Waters contract, Rex Jacobs took over the sales functions of the corporation and from that time on, people were employed in a sales capacity."

"In May of 1952 there were between fourteen and twenty people employed in the sales department of the company. Of that total six or seven were salesmen. The balance was composed of stenographers and other people keeping track of servicing the jobs. In addition to these fourteen or twenty people the various divisions had people whose salaries were also allocated to the sales costs of the company."

"Clare first brought up the matter of Rex's resignation from the company at the meeting of directors on May 13 and 14. The majority of the board of directors were dissatisfied with Rex's work or operations in Washington and in Florida. Rex's operations in Washington are referred to in the Fulbright Committee's report. As far as Florida is concerned Rex's operations down there were largely in connection with sales, in the winter time, with automotive company people who were in Florida at that time. The board felt that the company should not be operated from Florida."

"Rex spent about three months in Florida preceding the May 13 meeting. During those three months, he had been to the plant about once or twice."

"At the meeting of the company's board on May 13, Clare was asked whether he could guarantee that there would be no sales lost if Rex Jacobs resigned from the presidency. Clare refused to so guarantee. It was the consensus of the board that if Rex resigned, he could probably carry half of the company's automobile business to other firms. Out of that discussion the contract with J. F., Inc. developed."

"Sometime during the meeting of the board held on May 13 and 14, Rex became agreeable to resigning as president and taking on a sales contract."

"In February of 1952 some of the members of the board of directors expressed dissatisfaction with the way Rex was handling the sales end of the company and suggested that in the best interests of the company, Rex delegate all of the manufacturing functions of the office of presidency to somebody else in the company and confine himself to handling sales. The directors asked Clare Jacobs to go to Florida to talk to Rex about his taking over the chairmanship of the board of directors and confining his activities to sales only. Clare went to Florida to discuss the matter with Rex but there were no conclusions reached at that time."

"Sometime prior to May 13, Rex returned to Detroit for an executive committee meeting. At that meeting Rex proposed certain steps be taken in connection with the management of the company. John Jacobs and Clare Jacobs then demanded a board of directors meeting be called."

"John Jacobs, A. R. Jacobs, Rex Jacobs and Clare Jacobs comprised the executive committee at that time. A disagreement between Rex

Jacobs, and his followers on the board, and Clare Jacobs, and his followers on the board, was based upon a disagreement as to the operations of the plant and plant management concerning production rather than sales."

"At the meeting of May 13, 1952, Clare proposed a resolution calling for the resignation of Rex Jacobs as president. This resolution followed preliminary discussions between the various members of the board. The motion was seconded and started to be put to a vote. There followed a discussion of the resolution."

"Opposed to the resolution to depose Rex Jacobs were Rex, Waters and Vanden Bosch. The rest of the board was generally in favor of the resolution. However, the board was concerned about the effect of such a resolution on the company's sales and as a consequence did not want to proceed with the resolution unless the sales problem had been taken care of."

"Rex Jacobs might have made the statement that Rex could take with him half the sales of the company, in the automotive field, if he were forced to resign. Clare testified that he was not sure who first made that statement. The general feeling of the board was that if Rex stepped out, the company would be dependent upon the people in the sales force to continue the sales operations of the company and it was further the feeling of the directors that the sales force was not strong enough to control the situation."

"The directors who were favorable to Rex Jacobs were of the opinion that 3% was *possible to low*. Those directors were Waters and Vanden Bosch. Waters was then operating under a similar sales agency contract, at a higher percentage, for a company in Grand Rapids."

"There was some discussion at that meeting of May 13 and 14 regarding Rex's taking over some of the personnel of the company's sales division. It was agreed that he would take over all of the personnel as part of his cost of operation. It was also agreed at that time, that in return for the sales contract, he was to take over the obligations of the company under the other sales agency agreements the company then had."

"Clare testified that he was in favor of the contract with J. F., Inc. for the reason that it would reduce the company's sales expense. He further testified that there were schedules prepared by Ernst & Ernst showing the company's sales expense for previous years. He was not sure whether the schedules were presented to the board at the meeting of June 12, 1952 but he was sure that the members of the board had seen them at one time or another, in one form or another."

"Clare believes that he compared the schedule prepared by Ernst & Ernst with the contemplated cost to the company of the J. F., Inc. contract and concluded that the company's previous expense was greater than its future expense under the J. F., Inc. contract would be."

"Clare considered the J. F., Inc. contract to be desirable from the standpoint of the company for three reasons: (1) J. F., Inc. was thoroughly familiar with the company's products, for the reason that Rex Jacobs had handled them for a number of years and was considered one of the best salesmen in the automotive industry. (2) Because the company's costs under the contract were contemplated to be less than its sales costs prior to the contract. (3) That under a commission contract there would be more incentive in the sales department to increase the company's sales than there was

under a straight salary arrangement."

"The dissatisfaction *on* the board of directors with the way Rex was conducting the office of president of the company and which reached its peak around February of 1952, arose because Rex was spending much of his time in Florida instead of staying in Detroit. Rex went to Florida on the 5th or 10th of January, 1952. He first learned of the dissatisfaction from Clare Jacobs upon Clare's visit to him in Florida in February of 1952. Clare indicated to him that he was expressing the consensus of the members of the board of directors in stating that it would be in the best interests of the company if Rex devoted his time entirely to sales and allowed somebody else to handle the executive end of the business. At the meeting in Florida, Rex advised his brother Clare that he would consider the suggestion and would let him know his conclusion at the time of his next return to Detroit. At the next meeting of the board of directors on March 10, 1952, Rex refused to discuss the matter with the members of the board of directors. Rex told the members of the board of directors, either at the meeting or informally, that he had some question in his mind as to whether or not a change, such as suggested by Clare, could be effectuated because of the Wage Stabilization Board's policies."

"At the next executive committee meeting Rex decided that it was necessary to make some changes in the operating policy of the company. Clare, John and A. R. Jacobs disagreed with Rex's proposal and at that time demanded a special stockholders meeting. (Rex probably meant a directors meeting)."

"Rex had gradually worked out of any supervision of the production aspects of the company and at this time proposed to go back in and take active control of production. Clare, John and A. R. Jacobs demanded the directors meeting, which was held on May 13 and 14 and the directors backed Clare instead of Rex, relieved Rex of any responsibility over production, and confined Rex almost entirely to sales. Rex claimed that at that time, 'We had reached a point where we couldn't live together very well.' The contract resulted out of the various discussions had at the meeting of directors on May 13 and 14 in connection with Rex's proposals. There was no dissatisfaction expressed at that meeting in connection with the growth of the company's sales, under Rex's supervision."

"On June 20, 1952, J. F., Inc. had no sales employees. On that date, however, the company *in* J. F., Inc. adjusted their accounts so that J. F., Inc. took over the company's sales employees as of June 1, 1952. Further, on June 20th, J. F., Inc. had no equipment with which to perform sales activities. It had no out of town branches."

"Rex signed his letter of resignation, dated May 31, 1952, from the Grand Rapids Metalcraft Corporation, either in the company offices or in Mr. Klein's office. Either he dictated the letter of resignation or Mr. Klein dictated it. The resignation was signed on Saturday, May 31, 1952. It was signed in the presence of Mr. Klein and possibly Clare Jacobs. (The same testimony was given in connection with Rex's resignation from Continental Die Casting Corporation, Parts Manufacturing Company and the F. L. Jacobs Co.)"

"The Crocker and Goodale and the Essex contracts taken over by J. F., Inc. were at the same commission rates as they were with the F. L. Jacobs Co."

"Between the date of Mr. Mooney's letter of cancellation of the J. F., Inc. agreement and the date of

this deposition, J. F., Inc. discharged two of its salesmen who returned to the company, 'at the customers' request' at the time of the deposition, J. F., Inc. had on its payroll, a bookkeeper and a stenographer in addition to a sales staff consisting of Rex, Pardee, Gibson and Cahill, the three salesmen named were getting $25,000.00 a year. The bookkeeper was being paid approximately $500.-00 a month. The secretary was paid $400.00 a month."

"W. B. Hurd was appointed sales agent on a commission basis about 1938 or 1939. The contract became very valuable during the war growing in size from about $7,000,000 a year in sales to $100 million dollars a year. Dudley Waters, who at that time was a member of the Board of Directors, convinced Hurd that they should form a partnership. Waters then resigned from the Board and did not return to the Board of Directors until after he terminated his relationship with the sales agency at a later date. The agency was known as Hurd, Waters Company."

"A partnership known as Goodale and Crocker handled the Nash business for the company. That contract expired in June and had been in existence for about a year and a half."

"Rex handled the Ford account after the war. Then Pardee was engaged to handle the account. At a later date a sales agency contract was arranged with George Walker which lasted three or four years. Following the termination of the Walker contract, sales to Ford were handled by J. F., Inc."

"National Automotive Fibres, Inc. handled the sale of the company's products to Chrysler. That sales agency arrangement was of long standing and existed considerably before the war."

"Rex claims that J. F., Inc. added to the company's business. J. F.

doubled the Nash business. It also got electric window lift jobs. The electric window lifts were sold to Nash, Lincoln-Mercury, and Ford. In addition, J. F., Inc. acquired contracts for electric power seats, window vents and hard-top windows from Chrysler. Rex estimates that J. F., Inc. added from $700,000 to $800,000 a month in business to the company's sales."

"At the time the Board of Directors was considering executing the J. F., Inc. contract it had a schedule of the company's sales costs for several years previous. It had been developed by the company's comptroller, M. G. Bleitz. It is Rex's recollection that at the time the contract was signed, the company's sales were costing it 4.2% of its total sales."

"J. F., Inc. did not make any money its first few months because it had to furnish an office and sign a three-year lease. That expense was charged on the entire term of the contract. Because of the unrest in the industry about the change in the company and because of the company's loss of profits, Rex 'went overboard' in having his employees do extraordinary entertaining. 'We spent probably $5,000 or $6,000 a month more than we had to, anticipating getting back additional business.' "

"Clare Jacobs first became employed by the F. L. Jacobs Co. when it was organized in 1913. He was then vice-president in charge of manufacturing. The company had about six employees and was engaged in the welding business. From general welding the company began manufacturing automotive parts and continued to grow until the first World War. At that time the company had about 150 or 200 employees."

"Rex Jacobs joined the Company following World War I. He started

as superintendent of the plant and continued in that capacity until 1925 when his health began to bother him, after which time Clare resumed running the plant, and Rex became sales manager. The company grew until 1929–1930 when it was operated under a creditor's committee for a year or two. In 1935 or 1936 it acquired the Grand Rapids Metalcraft Corporation and the Anderson Company. The main plant of the company was on Canton and Lafayette. After acquiring Grand Rapids Metalcraft and Anderson, the company then acquired the Spruce Street plant."

"Rex Jacobs had been president of the company since 1935–1936 and was in charge of sales. Clare Jacobs was vice-president."

"Briggs, Winningham and Tracy felt that there was something wrong with the management of the company and as a result the board of directors authorized the employment of the Booz, Allen-Hamilton Company to survey the top management of the company. Clare, John and A. R. Jacobs felt that the survey had gone a good deal further than had been originally authorized. The survey extended down into the plants,—checked some of the management in the plants."

"Mr. Briggs consulted the Booz, Allen-Hamilton organization in connection with the contract with J. F., Inc. Clare believes that they gave Mr. Briggs an opinion that they thought it was 'the right thing to do.' "

"The other members of the Jacobs family seemed to feel that everything would be improved if the board could remove Rex from the company's management."

"Although Rex was the executive manager of the company, he primarily concerned himself with sales. The rest of the members of the Jacobs family had 'usurped' his other duties."

"The division among the members of the board of directors resulted in Briggs, Tracy, Winningham, John Jacobs and A. R. Jacobs supporting Clare Jacobs. Vanden Bosch and Waters supported Rex Jacobs."

"Ernst & Ernst prepared statistics going back a number of years that indicated that the basis that was worked out with Rex Jacobs on his exclusive sales contract was not unfavorable to the company based on an average of five years or so. In addition there was an analysis prepared for the year immediately preceding the execution of the contract. The last analysis showed a small fraction less cost than the 3% agreed upon with Rex."

"Vanden Bosch thought Rex was very valuable to the company. He thought Rex was a good executive; that he had 'wonderful sales abilities.' Vanden Bosch thought it would be a great loss to the company if it didn't have Rex in the sales end of the company in some way."

"Rex Jacobs was not present in Detroit during the period from January through April, 1952, and was not, therefore, actively managing the company during that period."

"Some of the other directors and officers of the company expressed dissatisfaction over his absence."

"John Jacobs and Clare Jacobs discussed with A. R. Jacobs the possibility of taking some action to require Rex Jacobs to return to Detroit."

The foregoing evidence would permit this Court to find that Clare Jacobs was first employed by the F. L. Jacobs Co. when it was organized in 1913, as vice president in charge of manufacturing, when the Company had six employees,

and that Rex Jacobs joined the Company following World War I, filling the position of superintendent of the plant until about 1925 when he became sales manager, and that neither one of these men was new to the business of the Company, but had grown up with it.

The Court would also be permitted to find that on other occasions the F. L. Jacobs Co. had entered into sales agreements with outside companies, and that the sales agreement between the Company and the Hurd-Waters Corporation terminated during 1944 or 1945, at which time Rex Jacobs took over the management of the sales organization, and that the expense of maintaining a sales force by the F. L. Jacobs Co. in May of 1952 was substantial.

In May 1952 the majority of the Board of Directors of the F. L. Jacobs Co. was dissatisfied with Rex Jacobs' business conduct as president of the Company. For the three months period immediately preceding May 13 Rex Jacobs had visited the plant on only one or two occasions, with the result that the majority of the Board was in favor of requesting his resignation as president, but was apprehensive about losing sales for the Company, as the Board felt that if Rex Jacobs resigned he would probably carry with him half of the Company's business to other competing firms, and during May of 1952 the Board of Directors of this Company was divided in its opinion as to what action should be taken, there being opposition by some of the Board members to the resolution calling for the resignation of Rex Jacobs as president. During this period the Board of Directors was made up of two factions, one group headed by Clare Jacobs, and the other by Rex Jacobs, the two groups being in disagreement on how the plant and plant-management should be operated as applied to production. On May 13, 1952, the Board relieved Rex Jacobs of all production responsibilities, at which time there was a decided split among the members of the Jacobs family in relation to the business affairs of the Company.

■ The sworn testimony adduced by Schreiber, by deposition, to assist him in proving the allegations of his complaint, provides the basis for the finding of this Court that the contract between F. L. Jacobs Co. and F. J., Inc. was entered into by the F. L. Jacobs Co. in the exercise of sound business judgment by its Board of Directors at a time when this Board was concerned about the loss of sales volume to the Company because of the forced resignation of Rex Jacobs, at a time when he had been in charge of sales for the Company since 1925 (with the exception of certain periods when the Company had sales agreements with other concerns) and in charge of customer contacts that were, to a degree, personal to himself.

At the time the contract was entered into by F. L. Jacobs Co., Rex Jacobs was not functioning as either an officer or director of the F. L. Jacobs Co.

A judicial appraisal of the value of a sales organization to any company is found in Masterson v. Pergament, 6 Cir., 203 F.2d 315, 333, wherein it is stated:

"It is common knowledge that an automobile manufacturer is only as good as his dealer and distributor organization."

In the light of the testimony made available to this Court for consideration, it is the opinion of the Court that the Board of Directors would have been guilty of mismanagement if they had failed to take steps to protect the operation of the Company's sales program at a time when the loss of the Company's best salesman was an imminent possibility.

■ The elements required to establish a civil conspiracy are the same as in a criminal conspiracy, and the charging part of the Schreiber complaint alleges that:

"Upon information and belief, in or about May 1952 all the then directors of the Company, each of whom had a full knowledge of the facts, entered into a conspiracy with Rex Closser Jacobs to mulct the

Company. The acts hereinafter alleged were committed pursuant to and in furtherance of said conspiracy."

Inasmuch as the Schreiber complaint is grounded almost completely upon information and belief, and since the evidence that he has discovered establishes the presence of a group of alleged conspirators who were actually divided in their opinions as to what disposition should be made of the resolution calling for the resignation of Rex Jacobs, and who were also divided on all other phases of the business of the company, the Court questions the presence of that concert of action necessary to prove an allegation of conspiracy.

"It is sufficient if the proof shows such a concert of action in the commission of the unlawful act or such other facts and circumstances from which the natural inference arises that the unlawful overt act was in furtherance of a common design, intention, and purpose of the alleged conspirators to commit the same." Calcutt v. Gerig, 271 F. 220, 222.

The Schreiber complaint further alleges that:

"The consolidated net sales of the Company, for its fiscal years (ended July 31) increased from $10,676,256 in 1946 (the first post-war year) to $30,430,980 in 1950 and $33,337,103 in 1951, the most recent year for which data is available to plaintiff."

According to the testimony available to the Court, this conceded and substantial increase in the sales of this Company was brought about while Rex Jacobs was in charge of sales for the Company, and, if this be true, how can the trier of the facts find anything unlawful or dishonest in the action of the Board of Directors in retaining for the Company the services of the person in charge of sales during the period of this increase?

From what the Court has before it for consideration, there cannot be found a dishonest combination of persons, acting in concert, to accomplish some wrongful act, even by inference, and, accordingly, there can be found only dubious merit to the allegations of the Schreiber complaint. The Court makes this finding in spite of the fact that the corporation aligned itself with the plaintiff in the Schreiber action, this alignment taking place shortly after the management changed hands, and at a time when the atmosphere was filled with lawsuits, and charges and countercharges were flying thick and fast and in all directions.

██ The essence of the Schreiber action is such that no one person can be separately charged with responsibility for the alleged damages, rather his complaint embraces the collective conduct and participation of the Board of Directors acting in concert with Rex Jacobs to defraud the Company and its stockholders; from the proof available at this stage of the Schreiber proceedings, there is lacking any showing of a common purpose supported by concerted action by the Board of Directors to defraud the Company and its stockholders, no showing that each of the directors had such an intention, and none that each understood that the other had that purpose, which need be established by proof to show the common intent, the collusive understanding, and the unlawful combination to defraud, the absence of which showing would result in failure of the Schreiber action.

At the deposition hearings it was developed that Rex Jacobs claimed that J. F., Inc. had added to the F. L. Jacobs Co.'s business; that J. F., Inc. had doubled the Nash business; that it also got electric window lift jobs, and that these electric window lifts were sold to Nash, Lincoln-Mercury and Ford; and, in addition, J. F., Inc. acquired contracts for electric power seats, window vents, and hard-top windows from Chrysler; and that during the existence of the contract, the sales agreement between F. L. Jacobs Co. and J. F., Inc., it was estimated that J. F., Inc. added

from $700,000 to $800,000 a month in business to the F. L. Jacobs Co.'s sales.

This course of business conduct on the part of the J. F., Inc. prior to a possible invalid termination of its contract with F. L. Jacobs Co. could provide a meritorious basis for a substantial recovery by J. F., Inc. in its litigation with the Company.

The Kinard suit seems to be of doubtful merit, other than as an instrument of harassment to a majority of the interested parties, since the primary allegation in that action involves the termination of the J. F., Inc. contract, which was brought about at a time when there was a complete changeover of management and an apparent desire on the part of the new management to dispose of all business contacts with the Jacobs family, and, while this may have been an error in business judgment, its construction as a breach of a fiduciary duty is of doubtful value.

Thomas J. Riggs, Jr. was sworn as a witness by the proponents for the settlement, and identified himself as having first accepted employment with the F. L. Jacobs Co. in January of 1953 as a sales coordinator and as having later been made general sales manager for the Company after the termination of the sales arrangement with J. F., Inc.; he then became a member of the Board of Directors and president about January of 1954. In relation to the impact of the pending lawsuits on the F. L. Jacobs Co., he testified in part as follows:

"* * * From a pure sales aspect, the suits themselves were damaging enough to the company in general. The publicity concerning the nature of the suits was most damaging—in fact, I would say conservatively requiring that our sales effort be diluted about 60 per cent to answer continual questions involving the litigation then being publicized in the papers. In other words, we were able to only put out, I would say, 40 to 50 per cent of productive sales effort. * * *"

He testified that he had been present at the meeting of the Directors discussing the settlement and had reviewed the considerations which led to the Board's recommendation that it be adopted by the stockholders, and that the considerations which impelled him to recommend the settlement were:

"Well, other than advice of counsel on the legal questions involved and the premises, I would say there were generally five business considerations, of which I have testified before, one being the sales question involved in lessening our productive effort in, let's say, securing sales, and also a continual bombardment of the company by questions involving the litigation, thereby diluting our sales effort and supplier reputation."

"The second is a matter of credit. The combination of this litigation, as we talk about it, did at one time, and to a lesser degree now, substantially limited or, let's say, practically excluded our credit with outside agencies. I speak now of the time when the combination effect of the garnishment action and the so-called appointment of a receiver for the company had us completely stripped of approximately two-and-a-quarter million dollars worth of capital, and, together with the other litigation, making it impossible for us to get funds—operating capital funds."

"Third, I think it's a very obvious dilution of executive and sales talent in the company—sales time. We have spent a great deal of time and are continuing to spend a great deal of time on the follow-up and the continual evaluation and study of these litigation problems."

"The fourth generally follows in the category of, in our discussion and evaluation of these suits, if we took them to Court versus the

sum eventually established as a settlement, what would be the continued cost of the legal cost of that litigation? The non-recurring legal costs could have been substantial."

"And fifth—let me go back a moment and review. * * * Obviously, in any study and evaluation of procedures of this type, there is the possibility, no matter how confident you may feel, of adverse results and the damages suffered thereby."

"I would say there are two other considerations also, and that is the actual dilutions or, let's say, practically elimination of working capital by virtue of the garnishment action, which has given us first originally a very severe problem, and then continuing to a lesser degree by posting of a bond in one instance of $750,000, and now the final reduction of that bond to the so-called settlement sum. * * * "

"Actually, the seventh and last point is that the injunction action, while not severely limiting, has limited our freedom of action in normal businesslike approach—let's say the complete freedom of a normal business operation."

Mr. Riggs is not named as a defendant in any of the pending lawsuits.

Mr. Kadel was also produced as a witness by the proponents of the compromise, and identified himself as a lawyer authorized to practice law in New York State, and further identified himself as a member of the Board of Directors of the F. L. Jacobs Co. since January of 1953, having been elected a director at a meeting of stockholders in December of 1952, that being the meeting at which the new management was installed by the stockholders. He further identified himself as being familiar with all of the pending lawsuits and stated that he acted as general counsel for the Company in relation to evaluating the merits of the different pending lawsuits and, in conjunction with

his own opinion regarding this litigation, he also consulted with independent counsel of excellent reputation, and that he advised the Board as to his conclusions, and corroborated the testimony of Mr. Riggs that the uncertainties of the litigation, the possibility of an adverse judgment in the $3,000,000 J. F., Inc. damage suit, the probability of protracted appeals, regardless of the outcome of the litigation, dissipation of the Company's executives' time, the cost of the litigation, its adverse effect upon the Company's customer relations and its credit, were the considerations which led the Board of Directors and officers of the Company to approve and enter into the agreement of settlement.

The approval of the agreement of settlement was arrived at by the Board of Directors of the F. L. Jacobs Co., none of whom was a member of the Board at the time that the complained-of transactions alleged in the Schreiber suit, the J. F., Inc. suit, and the F. L. Jacobs suit were entered into by the corporation, and this Court is in possession of no evidence, either direct or circumstantial, that would establish that the Board of Directors of the F. L. Jacobs Co. acted oppressively or fraudulently or not as proper corporate representatives without self-interest in approving the settlement agreement:

"For, two courses of action are open to the court, either of which insure adequate protection of all the interests involved. It may inquire and decide whether, in proposing to enter into the compromise for the corporation, the directors are acting oppressively or fraudulently, or as proper corporate representatives without self-interest. And if the latter be determined, the court need inquire no further into the merits of the settlement; the corporation is then as free to act as if it had been the original plaintiff. If, however, the court has doubts as to the openmindedness of the directors, it may disregard en-

tirely the assent of the corporation, and, after examining all the circumstances, reach an independent decision on the fairness of the settlement." (Cf. McLaughlin, Capacity of Plaintiff-Stockholder to Terminate a Stockholder's Suit, 46 Yale Law Journal, 421, 433.)

Within four months after the new management took over, it filed a suit in Chancery in the Wayne County Circuit Court against the former directors of the F. L. Jacobs Co. charging waste and mismanagement.

One cannot listen to the testimony of Mr. Riggs and Mr. Kadel without forming the conclusion that the matter of the pending litigation, with its restraining effect and with the hovering shadow of a petition for a receivership, was an actual threat to the future welfare of a business that had just started to operate under new management; and that the action of the new Board of Directors in approving the agreement of settlement was in the exercise of a sound business judgment in having, as its objective, the termination of litigation that was oppressive to the corporation.

The action of the Board of Directors in deciding upon a dismissal, with prejudice, of the F. L. Jacobs suit for an accounting from the former Board of Directors is explained as follows:

"Q. Mr. Kadel, at the time you were negotiating for the settlement, did you attempt at least to have the dismissal of the accounting action be a dismissal without prejudice rather than with prejudice, as against all of these defendants who are not contributing anything? A. We were working on a package situation. We could not make the settlement with J. F. without disposing of all litigation. Mr. Fitzgerald made that very clear in our negotiations.

"Q. Could you give me any idea how the figure of $210,000 was arrived at? Is there any particular basis for it? A. Well, I think they started with $450,000, $500,-000 and then we went up from $25,-000 to $50,000, and then we went up to $75,000, and then we went up to $80,000, and they came down a little, and finally we arrived at a figure of $210,000." (T.R. 61)

In view of the end result that the agreement of settlement will attain, this Court is of the opinion that the action of the Board of Directors in deciding to dismiss the F. L. Jacobs accounting action was reasonable under all the circumstances.

Another factor which has been considered by this Court in making a determination in this matter is the action of such a substantial majority of the common stockholders acting in good faith in approving the settlement agreement—a majority in no way involved in the acts complained of.

The opinions rendered by reputable counsel to the effect that there are present doubtful questions of law and fact in relation to some of the controversy involved in this settlement have been given consideration by the Court. The Court has also taken under consideration the fact that the trials of the different lawsuits would undoubtedly be long, and would involve substantial legal expense to the F. L. Jacobs Co., and would cause a diversion of the proper attention of the officers of the corporation from the business of the corporation; that the pending litigation has had an adverse effect on the good will of the corporation, and that a trial of all or any of the lawsuits pending would produce an intensification of such adverse effect.

In view of the foregoing, it is the opinion of this Court that the proponents of the agreement of settlement have established that the proposed agreement is fair, and that an acceptance of its terms will be to the best interests of the F. L. Jacobs Co. and the Court does so conclude.

An order may be submitted in accordance with this opinion.